IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America

v.

Tilrome Bell

Case No. 23 CR 311

Judge Jorge L. Alonso

## Memorandum Opinion and Order

Before the Court is Defendant Tilrome Bell's motion to dismiss the indictment charging him with possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1) (ECF No. 17).[1] For the reasons below, the Court denies Defendant's motion to dismiss and finds that § 922(g)(1) does not violate the Second Amendment.

## Background

According to the government, on January 1, 2023, police arrested Defendant after seeing him discharge a handgun in an alley. (ECF Nos. 1, 19 at 2.) At the time, Defendant had five previous felony convictions on his criminal record: three for manufacture/delivery of a controlled substance, one for aggravated battery of a peace officer, and one for aggravated DUI. (ECF No. 19 at 2.)

A federal grand jury charged Defendant with a single count of knowingly possessing a firearm that had been transported in interstate commerce as a felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Defendant has moved to dismiss the indictment, claiming that this charge violates his rights under the Second Amendment to the U.S. Constitution following the

---

[1] Defendant also filed a motion for leave to file a 34-page reply in support of his motion to dismiss (ECF No. 26), which the Court grants.

U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (ECF Nos. 17.) The government opposes Defendant's motion.

## Legal Standard

A "party may raise by pre-trial motion any defense, objection, or request that the court can determine without a trial on the merits," including a claimed constitutional violation. Fed. R. Crim. P. 12(b)(1). When considering a motion to dismiss an indictment, the Court takes the indictment's factual allegations as true and views the facts in the light most favorable to the government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999).

## Discussion

The Second Amendment states, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," though the right is "not unlimited." 554 U.S. 570, 626, 635 (2008). In *Bruen*, the Supreme Court set forth a two-step framework to evaluate Second Amendment challenges. First, a court evaluates whether "the Second Amendment's plain text covers an individual's conduct," thereby "presumptively protect[ing] that conduct." 142 S. Ct. at 2126. If so, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" for it to be upheld. *Id.*

Section 922(g)(1) makes it unlawful "for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year [that is, a "felon"] to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported

2

in interstate or foreign commerce." 18 U.S.C. § 922(g)(1) (cleaned up). Though most courts to have considered the constitutionality of § 922(g)(1) following *Bruen* have found it constitutional, others have struck down the statute on Second Amendment grounds. *Compare, e.g.*, *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) *and United States v. Gates*, No. 1:22-CR-00397-1, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023) (upholding statute) *with Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) *and United States v. Prince*, No. 22 CR 240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) (holding statute unconstitutional).

The Seventh Circuit recently considered a Second Amendment challenge to § 922(g)(1), but remanded the case to the district court to consider the issue in light of the Supreme Court's intervening *Bruen* decision and its text-and-history standard. *See Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). The Seventh Circuit also listed five questions to help focus the analysis on remand:

1. Does § 922(g)(1) address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?"

2. What does the history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1).

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of

3

> historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1).
>
> 4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.
>
> 5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are "relevantly similar," including in terms of how and why the regulations burden gun rights).

*Id.* at 1023–24.

With these questions in mind, the Court applies *Bruen*'s text-and-history standard and concludes that § 922(g)(1) does not violate the Second Amendment.

1. **Plain Text**

The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. The government argues that felons like Defendant do not fall within "the people" protected by the Second Amendment, so the Second Amendment does not protect their conduct at all. Defendant counters that "the people" protected by the Second Amendment include felons like him and thus his conduct is presumptively protected.

The Supreme Court stated in *Heller* and reiterated in *Bruen* that the Second Amendment protects certain conduct of "law-abiding citizens." *See, e.g.*, *Heller*, 554 at 635 (referencing "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *Bruen*,

142 S. Ct. at 2122 ("ordinary, law-abiding citizens have a [] right to carry handguns publicly for their self-defense"). It also stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. In the government's view, this means that "the people" referenced by the Second Amendment's plain text therefore do not include felons since felons are not "law-abiding citizens."

The Court disagrees. Though the Supreme Court has repeatedly indicated that its decisions invalidating certain regulations on Second Amendment grounds do not undermine regulations for felons, it has not squarely addressed the issue as part of the first-step analytical issue of whether felons are part of "the people." *See Gates*, 2023 WL 5748362, at *4 ("The bottom line is that *Heller*'s and *Bruen*'s repeated references to 'law-abiding citizens' do not establish the proposition that the Supreme Court has already answered whether the Amendment's plain text covers firearms possession by felons.") (citations omitted). In fact, before *Bruen*, the Seventh Circuit had clarified that *Heller*'s references to "'law-abiding citizens' and 'members of the political community' . . . did not reflect an attempt to define the term 'people,'" and was "reluctant to pass more weight on these passing references than the Court itself did." *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (quoting *Heller*, 554 U.S. at 580, 625). This Court therefore concludes that the Supreme Court's comparable references to "law-abiding citizens" in *Bruen* did not decisively hold that felons are excluded from "the people" protected by the Second Amendment.

In *Meza-Rodriguez*, the Seventh Circuit also flagged language suggesting "that all people . . . enjoy at least some rights under the Second Amendment," and that "the people" protected by the Second Amendment are the same as those protected by the First and Fourth Amendments. *Id.*

5

It therefore concluded "that the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights." *Id.* at 670. The Supreme Court made this same comparison in *Heller*, where it linked the "right of the people" reflected in each of the First, Second, and Fourth Amendments as "unambiguously refer[ring] to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Heller*, 554 U.S. at 579. It contrasted that scope of "the people" in those Amendments with that of "the people" in other constitutional contexts, such as Article I's provision that "the people" will choose members of the House of Representatives. *Id.* at 579–80 (stating that those contexts "deal with the exercise or reservation of powers, not rights"). The Court therefore concluded there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

Just as in the First and Fourth Amendment contexts, that a broad swath of the American public may presumptively enjoy Second Amendment rights does not render those rights unlimited—they may be stripped from certain groups or settings. *See Heller*, 554 U.S. at 595 ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not[.]" (citation omitted)); *see also, e.g.*, *Samson v. California*, 547 U.S. 843, 857 (2006) (authorizing suspicionless searches for parolees under the Fourth Amendment); *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (recognizing "historic and traditional categories" of First Amendment restrictions, such as "statements directed at producing imminent lawless action, and likely to do so" (internal quotation marks and citations omitted)). But the question of whether a particular group falls within "the people" presumptively protected by the Second Amendment precedes the question of whether that protection may be limited or stripped from that group consistent with this country's historical traditions. *See Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir.

6

2019) (Barrett, J., dissenting) (agreeing "that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right"). Here, the Court concludes that felons like Defendant fall within the meaning of "the people" and thus are presumptively protected by the Second Amendment.

## 2. Historical Tradition

The Court next considers whether § 922(g)(1)'s prohibition on convicted felons possessing firearms is consistent with the nation's historical tradition of firearm regulation, and concludes that it is.

In conducting this analysis, the Court applies analogical reasoning that "is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Ultimately, the Court considers whether felon dispossession and the government's cited historical analogues "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*, 142 S. Ct. at 2133. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

No historical dead ringers exist for § 922(g)(1)—"the first federal statute disqualifying felons from possessing firearms was not enacted until 1938," and "the ban on possession by *all* felons was not enacted until 1961." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (emphasis in original). Instead, the government points to two kinds of historical regulations as analogous to § 922(g)(1): firearm-disqualification laws and felony-punishment laws. The Court addresses each in turn and finds that those historical regulations comparably addressed societal problems of disarming or otherwise punishing felons and other groups deemed dangerous or untrustworthy to obey the law, thus rendering § 922(g)(1) constitutional.

First, the government argues that firearm-disqualification regulations from pre-colonial England, Colonial America, the Revolutionary War, and the ratification debates are sufficiently analogous to § 922(g)(1) to pass Second Amendment scrutiny post-*Bruen*.

Though "historical evidence that long predates" the ratification of the Second Amendment "may not illuminate the scope of the right," historical English law is still relevant here because the Second Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2119; *Heller*, 554 U.S. at 599. The 1689 English Bill of Rights protected a right to bear arms, but only for Protestants and only "as allowed by law." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688). That same year, the English government also passed a law disarming Catholics who refused to renounce their faith and thus were considered untrustworthy. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688); *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (noting that "Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'" (citing Adam Winkler, Gunfight 115 (2011)). Prior to this, the ruling English monarchs had disarmed nonconformist Protestants, including pacifist denominations, who often refused to take oaths acknowledging the sovereign's authority over religious matters and thus were not trusted to abide by the law. *See Range*, 69 F.4th at 120–21 (Krause, J., dissenting) (citations omitted).

Colonial America had its own examples of firearm prohibitions related to particular groups, such as Native Americans and enslaved persons, that were considered dangerous or not law-abiding, or otherwise not entitled to constitutional protections.[2] *See Range*, 69 F.4th at 122–24 (Krause, J., dissenting) (citations omitted); *United States v. Hardy*, No. 23 CR 129, 2023 WL

---

[2] Many of those laws would be unconstitutional today on other grounds, but still "are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503.

6795591, at *5 (N.D. Ill. Oct. 13, 2023) (citation omitted). (*See also* ECF No. 19 at 25 n.12 (collecting colonial laws).) There also were laws disarming "free, Christian, white men" "whom the authorities believed could not be trusted to obey the law," including a Massachusetts law disarming supporters of a 1630s preacher because "the authorities concluded their conduct evinced a willingness to disobey the law." *Range*, 69 F.4th at 122–23 (Krause, J., dissenting). And during the Revolutionary War, legislatures disarmed people who failed to show loyalty or obedience to the government and thus were not trusted to obey the law. *Id.* at 124–26 (describing regulations in Connecticut, Virginia, and Pennsylvania). Like the disarmament laws in England, these laws did not target merely those deemed dangerous—in Pennsylvania, for example, "the disarmament law deprived sizable numbers of pacifists of that right. . . . Those groups were not disarmed because they were dangerous[.]" *Id.* at 125. Rather, they were disarmed out of a concern that "they would not submit to communal judgments embodied in law"—that is, that they were not trusted to obey the law. *Id.* at 125–26.

During the 1787 ratification debates between the Federalists and Anti-Federalists in Pennsylvania, Anti-Federalists proposed a constitutional amendment that would have authorized disarmament "for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971). Other state ratification conventions similarly considered firearms-rights amendments that would have applied only to "peaceable citizens" or those who had not been in "Actual Rebellion." *Id.* at 681, 758, 761 (discussing proposed amendments in Massachusetts and New Hampshire). Though these proposed amendments were not adopted at the time (the Second Amendment was later ratified as part of the Bill of Rights in 1791), they reflect an understanding at the time that past criminal

activity could justify disarmament. *See Gates*, 2023 WL 5748362, at *8 (citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008)).

Overall, though the above-discussed historical firearm-disqualification laws do not exactly match § 922(g)(1)'s disarmament of convicted felons, they are sufficiently analogous for § 922(g)(1) to pass Second Amendment scrutiny by providing a historical tradition of disarming dangerous and non-law-abiding persons. *See Bruen*, 142 S. Ct. at 2133 (requiring only "a well-established and representative historical *analogue*, not a historical *twin*" (emphasis in original)).

Next, the government points to various historical punishments against felons, including capital punishment and estate forfeiture for felons in England and early America, as analogous to § 922(g)(1). *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 95 (1772) (defining a felony as "an offense which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded"); *An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790) (the First Congress making various violent and non-violent felonies punishable by death); *Gates*, 2023 WL 5748362, at *8 (citing, in addition to the foregoing, Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing capital punishment for felonies in the late 18th century as "the standard penalty for all serious crimes")); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn. 275, 276 (2014) (citing statutes authorizing complete forfeiture of a felon's estate). This included numerous colonial laws imposing capital punishment and estate forfeiture for violent and non-violent crimes alike. *See, e.g.*, 1 *The Laws of Maryland, With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811) (1715 law making causing injury via embezzlement or alteration of a will or record

10

punishable by estate forfeiture and other punishments); *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33–34 (1767) (1743 law making counterfeiting punishable by death and estate forfeiture); *A Digest of the Laws of Maryland* 255–56 (1799) (collecting 1776–78 laws making forgery punishable by death); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302–03 (1821) (1777 law making forgery punishable by estate forfeiture and other punishments); 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)* 664–65 (1886) (1788 New York law making counterfeiting and other crimes punishable by death).

  Though the fact that a crime is punishable by death does not automatically authorize the government to strip a person convicted of that crime from all constitutional rights, it does highlight the degree to which felons historically have been subject to severe penalties upon conviction—and thus that firearms dispossession for felons under § 922(g)(1) does not present an outsized or unjustified burden. *See Bruen*, 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (quotation marks and citation omitted)). Ultimately, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).

  Modern technological developments and related societal concerns further inform the Court's analysis. *See Bruen*, 142 S. Ct. at 2132 (distinguishing between historical analogies that are "relatively simple to draw" and "other cases implicating unprecedented societal concerns or

11

dramatic technological changes [that] may require a more nuanced approach"). Firearms today are far more advanced than those existing when the Second Amendment was ratified. At that time, most guns "could not fire more than one shot without being reloaded," and their overall firepower paled in comparison with that of modern firearms. *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015). The Supreme Court similarly considered advancements in firearms technology when concluding that a historical common-law rule authorizing deadly force by the police against all fleeing felons in all circumstances was too broad given advancements that enabled "deadly force from a distance." *Tennessee v. Garner*, 471 U.S. 1, 15 (1985). It reasoned that "[a]s a practical matter, the use of deadly force under the standard articulation of the common-law rule ha[d] an altogether different meaning—and harsher consequences—now than in past centuries." *Id.* Likewise here, the increased firepower and accessibility of modern firearms loosen the degree to which § 922(g)(1) must resemble historical regulations. *See Atkinson*, 70 F.4th at 1023 (asking whether § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century" (quoting *Bruen*, 142 S. Ct. at 2131)); *Gates*, 2023 WL 5748362, at *8–9 ("Firearms technology has advanced at a rapid pace, far outstripping the firearms-related problems that legislatures had to address in 1791."). This bolsters the sufficiency of the government's offered historical analogues under *Bruen*.

Section 922(g)(1)'s disarmament of felons also is consistent with the Supreme Court's frequent references to the right to bear arms enshrined in the Second Amendment as a right for "law-abiding citizens." *See, e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2133 (referencing "a law-abiding citizen's right to armed self-defense"). Indeed, the Court specified in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," like the one Defendant now challenges. *Heller*, 554 U.S. at

626; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., dissenting) (quoting same and reiterating that "[p]roperly interpreted, the second Amendment allows a 'variety' of gun regulations"). In sum, the Court finds that § 922(g)(1) is sufficiently analogous to historical felon-punishment and firearm-dispossession regulations to survive Second Amendment scrutiny.

3. As-Applied Challenge

Lastly, Defendant appears to raise an as-applied challenge to § 922(g)(1) by claiming that his criminal record included only "non-political street crime" and not "organized seditious revolt." As indicated above, historical regulations did not limit capital status and its attendant punishments to violent or seditious crimes. *See Medina*, 913 F.3d at 158 ("Felony crimes in England at the time included crimes of violence . . . but also included nonviolent offenses that we would recognize as felonies today . . . . For example, at the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses."). Violence or sedition was not a historical prerequisite to disarmament, and analogous regulations applied capital status or disarmament to entire groups and offense categories, rather than requiring a particularized assessment of each group member's dangerousness or untrustworthiness. *See Jackson*, 69 F.4th at 504 ("[I]f dangerousness is considered the traditional *sine qua non* for dispossession, then history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."). Moreover, the Supreme Court in *Heller* and *Bruen* repeatedly referred to Second Amendment protections for "law-abiding citizens," not for "non-violent" or "non-seditious" citizens. The Court thus need not undertake a felony-by-felony or felon-by-felon assessment to evaluate § 922(g)(1)'s constitutionality. Defendant's as-applied challenge to § 922(g)(1) therefore fails.

## Conclusion

For the above reasons, the Court finds that 18 U.S.C. § 922(g)(1) does not violate the Second Amendment, including as applied to Defendant's criminal charge in this case. The Court accordingly denies Defendant's motion to dismiss (ECF No. 17). The Court grants Defendant's motion to exceed the page limit (ECF No. 26.)

SO ORDERED.                                   ENTERED: December 7, 2023

_____

**HON. JORGE ALONSO**
**United States District Judge**